IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO. ___2:22-cr-568___ |
| | ) | |
| | ) | 18 U.S.C. § 371 |
| vs. | ) | 18 U.S.C. § 1347 |
| | ) | 18 U.S.C. § 981(a)(1)(C) |
| **HEATHER LAMBERT** | ) | 28 U.S.C. § 2461(c) |
| | ) | |
| | ) | **INFORMATION** |
| | ) | |

**THE UNITED STATES ATTORNEY CHARGES:**

1.    The Medicare Program ("Medicare") is a federal health care program providing benefits to persons who are over the age of sixty-five and some persons under the age of sixty-five, who are blind, or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS").

2.    TRICARE is a federal health care program run by the United States Department of Defense Military Health System, and it provides coverage for military beneficiaries worldwide, including active-duty service members, National Guard and Reserve members, retirees, and families. Individuals receiving healthcare benefits through TRICARE are known as TRICARE beneficiaries.

3.    Medicare and TRICARE[1] are "health care benefits programs," as defined by Title 18, United States Code, Section 24(b), in that they are public plans affecting commerce under

---

[1]TRICARE is a health benefit plan established by Congress and funded through federal appropriations provided to active and retired service members of all eight branches of the Uniformed Services and their eligible dependents. 32 CFR § 199.8 states when TRICARE beneficiaries receive medical coverage under Medicare, Medicare is the primary payer.

which medical benefits, items, and services are provided to individuals and under which individuals and entities who provide medical benefits, items, or services may obtain payments. In addition, Medicare and TRICARE are "Federal health care programs" as defined in Title 42, United States Code, Section 1320a-7b(f).

4.     Part B of the Medicare Program is a medical insurance program that covered, among other things, certain durable medical equipment ("DME"). Specifically, Medicare Part B covers the reasonable and medically necessary services to treat the patient's illness or injury such as physician office services and physical therapy rendered by the appropriate clinician, and the ordering of DME orthotics to include knee and back braces, and cervical collars. Medicare Part B also provides coverage for orthotics management and training for upper or lower extremity(ies) and/or trunk for the initial orthotic(s) encounter.

5.     Additionally, Medicare provides coverage for X-rays ordered by a clinician.

6.     Medicare doesn't pay for medically unreasonable and unnecessary services and supplies to diagnose and treat a patient's condition.

7.     By becoming a participating provider in Medicare, enrolled providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Health care providers were given and provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

8.    Medicare regulations required health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician. Medicare requires complete and accurate patient medical records so that Medicare may verify that the services were provided as described on the claim form. These records were required to be sufficient to permit Medicare, through their contractors, to review the appropriateness of Medicare payments made to the health care provider.

## COUNT 1
### (Conspiracy to Commit Healthcare Fraud)

### The Conspiracy

9.    From at least in or around September 2017, and continuing up to in or around January 2020, in the District of South Carolina and elsewhere, **HEATHER LAMBERT**, and others, known and unknown,  knowingly and intentionally combined, conspired, confederated, agreed, and had a tacit understanding to knowingly and willfully devised a scheme and artifice to defraud federal health care programs and to obtain by means of false and fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in violation of Title 18, United States Code, Section 1347.

10.    It was the object of the conspiracy for the **LAMBERT**, and others, known and unknown, to enrich themselves and maximize profits at the expense of the United States and patients by participating in the following scheme.

<u>Manner and Means of the Conspiracy</u>

11.     The manner and means of the conspiracy operated substantially as follows and includes, but is not limited to:

a.     **HEATHER LAMBERT**, a licensed Chiropractor, was the owner and Chief Executive Officer of Atlantic Coast Integrated Medicine ("ACIM").

b.     Coconspirator B, ACIM's biller, became an owner of ACIM on or about September 2017 along with Coconspirator A who became a 15% owner of ACIM on or about September 2017.

c.     Coconspirator B was a supervising biller and Coconspirator A was a supervising clinician at ACIM prior to September 2017. They both continued these roles after becoming owners of ACIM.

d.     ACIM had protocols in place prior to and after September 2017, that were expanded after September 2017, to provide Medicare beneficiaries usually the same standard of care no matter their injury or illness.

e.     ACIM and its clinicians usually used a standardized treatment plan for ACIM patients, including Medicare beneficiaries, that lasted 12 weeks with the expectation for the patient to receive services at ACIM three times per week.

f.     Followed by an initial evaluation consisting of a head to feet musculoskeletal exam and more than a dozen x-rays ordered by an ACIM and/or ACPM clinician, the treatment plan, authorized by an ACIM clinician, consisted of chiropractic adjustments, physical therapy,

4

injections, further diagnostic testing, and the issuing of multiple DME.

g.      Usually, on the same day the treatment plan was authorized, an ACIM clinician ordered multiple medically unnecessary DME, including cervical collars, to be issued to the beneficiaries throughout their treatment plan and billed to Medicare.

h.      ACIM billed Medicare for these services in addition to orthotics management and training. ACIM billed Medicare for this service on the day of the patient's initial encounter and other days; however, the beneficiary did not receive any DME on the day it was billed or was not trained on any DME.

i.      Unless an ACIM patient specifically denied a certain service or DME, the beneficiary received, and Medicare was billed for all the services in the standard treatment plan. For example, if a Medicare beneficiary presented to ACIM seeking treatment for pain in their lower back and in one of their knees, ACIM would still issue the patient and bill Medicare for a medically unnecessary cervical collar.

j.      After September 2017, ACIM staff and non-supervisory clinicians expressed to the ACIM owners that the services being rendered and the DME being issued to Medicare beneficiaries were unnecessary; however, ACIM continued billing Medicare for medically unnecessary DME and services.

Overt Acts

12.     In furtherance of the conspiracy and to effect the objects of the conspiracy, **HEATHER LAMBERT**, Coconspirator A, and Coconspirator B committed the following overt acts, among others, in the District of South Carolina:

> a.     On or about January 30, 2018, **HEATHER LAMBERT**, Coconspirator A, and Coconspirator B caused the submission of Claim No. 830218054372652 in the amount of $70.00 to Medicare for Medicare Beneficiary P.P. for Code 97760 – Training in the Use of Orthotics.
>
> b.     On or about July 23, 2019, **HEATHER LAMBERT**, Coconspirator A, and Coconspirator B caused the submission of Claim No. 830219207430712 in the amount of $70.00 to Medicare for Medicare Beneficiary R.H. for Code 97760 – Training in the Use of Orthotics.[2]
>
> c.     On or about October 18, 2018, **HEATHER LAMBERT**, Coconspirator A, and Coconspirator B caused the submission of Claim No. 118247802749000 in the amount of $475.00 to Medicare for Medicare Beneficiary P.N. for Code L0180 – Cervical, multiple post collar.
>
> d.     On or about September 5, 2019, **HEATHER LAMBERT**, Coconspirator A, and Coconspirator B caused the submission of Claim No. 119227709556000 in the amount of $475.00 to Medicare for Medicare Beneficiary M.K. for Code L0180 – Cervical, multiple post collar.

---

[2] TRICARE was the secondary insurance carrier and was impacted based on the submission of this Medicare claim.

All in violation of Title 18, United States Code, Section 371.

## **FORFEITURE**

CONSPIRACY:

Upon conviction for violation of Title 18, United States Code, Section 371 (conspiracy to violate 18 U.S.C. § 1347) as charged in the Information, the Defendant, **HEATHER LAMBERT**, shall forfeit to the United States any property, real or personal, constituting, derived from or traceable to proceeds the Defendant obtained directly or indirectly as a result of such offense.

PROPERTY:

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the property subject to forfeiture includes, but is not limited to, the following:

Cash Proceeds/Forfeiture Judgment:

A sum of money equal to all proceeds the Defendant obtained, directly or indirectly, from the offense charged in this Information, and all interest and proceeds traceable thereto, and/or that such sum equals all property derived from or traceable to her violation of 18 U.S.C. §§ 371 and 1347.

SUBSTITUTE ASSETS:

If any of the property described above as being subject to forfeiture, as a result of any act or omission of the Defendant –

(a)     cannot be located upon the exercise of due diligence;
(b)     has been transferred or sold to, or deposited with, a third person;
(c)     has been placed beyond the jurisdiction of the Court;
(d)     has been substantially diminished in value; or
(e)     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by 18 U.S.C. § 982(b)(1), to seek forfeiture of any other property of the said

7

Defendants up to the value of the above described forfeitable property;

Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States

Code, Section 2461(c).

COREY F. ELLIS
UNITED STATES ATTORNEY

By: AMY BOWER  Digitally signed by AMY BOWER
Date: 2022.06.22 10:54:02 -04'00'
Amy F. Bower (Fed. ID 11784)
Assistant United States Attorney
151 Meeting Street, Suite 200
Charleston, SC 29401
Tel.: 843-727-4381
Fax: 843-727-4443
Email: amy.bower@usdoj.gov